Docket No. 12-56892

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

HELEN GALOPE, on behalf of herself and all others similarly situated,

*Plaintiffs - Appellants,*

v.

DEUTSCHE BANK NATIONAL TRUST COMPANY, AS TRUSTEE UNDER POOLING AND SERVICING AGREEMENT DATED AS OF MAY 1, 2007 SECURITIZED ASSET BACKED RECEIVABLES LLC TRUST 2007-BR4; WESTERN PROGRESSIVE, LLC; BARCLAYS BANK PLC; BARCLAYS CAPITAL REAL ESTATE INC. d/b/a HOMEQ SERVICING; OCWEN LOAN SERVICING, LLC, and DOES 4 through 10, Inclusive,

*Defendant - Appellee.*

---

## APPELLANT'S COMBINED REPLY BRIEF IN RESPONSE TO ALL APPELLEES' BRIEFS

---

APPEAL FROM THE U.S. DISTRICT COURT
For the Central District of California, Santa Ana
Case No. 8:12-cv-00323-CJC (RNBx) The Honorable Cormac J. Carney, Presiding

---

Lenore L. Albert, Esq. SBN 210876
Law Offices of Lenore Albert
7755 Center Avenue, Suite #1100
Huntington Beach, CA 92647
Ph: 714-372-2264  Fx: 419-831-3376
Email: lenalbert@interactivecounsel.com
*Counsel for Plaintiffs – Appellants, Helen Galope*
*On behalf of herself and all others similarly situated*

# TABLE OF CONTENTS

I.   INTRODUCTION ...................................................................................1

II.  ARGUMENT.......................................................................................6

A. Article III Standing Was Alleged In this Case............................................ 6

B. Eight Key Pieces of Evidence Existed To Proceed with the Antitrust
   Claim ...................................................................................................10

   1. Plaintiff Purchased a LIBOR Loan Product From the
      Defendants Who Were Manipulating LIBOR Market Rates..............11

   2. The Injury is Fairly Traceable To the Defendants ............................13

   3. The Defendants Profited Through the MBS Trust Which Used
      LIBOR for The Interest rate and Cap SWAPS .................................14

   4. Plaintiff Had Standing as a Direct Purchaser Under Antitrust
      Law.........................................................................................................15

      a.  Rational Expectations Test.......................................................15

      b.  Consumer Expectations Test....................................................17

      c.  Direct Injury Test and *Illinois Brick*........................................17

   5. There was Evidence of a Contract, Combination or Conspiracy
      Between DBNTC and Barclays........................................................18

C. Standing Under the UCL was Adopted from Article III .............................19

D. UCL Claims Could Not Be Released .........................................................20

1. Alteration of the Modification Document by Defendants Extinguished the Contract .................................................20

2. The Release is Void Against Public Policy .......................................21

3. DBNTC was Personally Liable for Manipulation.............................21

4. Restitution Is Allowed Under the UCL ...........................................21

5. Fraudulent Business Practices Do Not Require FRCP 9(b) Pleading .........................................................................................23

6. Selling the Home During A Bankruptcy Stay Was a UCL Violation ........................................................................................23

E. The Defendants Are Capable of Foreclosing Again in Violation of Plaintiff's Federal Rights .............................................................25

F. Equity Is Not Required for a Wrongful Foreclosure Claim ........................26

G. Aiding and Abetting of the UCL Was Tied to the UCL Claim ...................26

H. The FAL Claim Was Not Time Barred .....................................................27

I. Evidence Supported a Genuine Issue of Material Fact on the FAL Claim ...........................................................................................30

J. Plaintiff Had Standing to Bring A Breach of Good Faith and Fair Dealing Claim And the Land Records Supported Reversal of Summary Judgment ...................................................................30

K. The Fraud Was A Pattern and Practice That Was Fairly Traceable to Defendants ...................................................................................32

III.   CONCLUSION ..........................................................................33

IV.    STATEMENT OF RELATED CASES ......................................................34

V.     CERTIFICATE OF WORD COUNT..........................................................35

VI.    PROOF OF SERVICE ...............................................................................36

# TABLE OF AUTHORITIES

## Supreme Court Opinions

*DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332 (2006) ........................................ 13

*Hollingsworth v. Perry*, 133 S. Ct. 2652 (2013) .................................................... 9

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ...................................... 9, 12

## Ninth Circuit Opinions

*Columbia Steel Casting Co. v. Portland GE*, 111 F.3d 1427 (9th Cir. 1996) ....... 16

*DeMando v. Morris*, 206 F.3d 1300 (9th Cir. 2000) ............................................ 22

*Gest v. Bradbury*, 443 F.3d 1177 (9th Cir. 2006) ............................................... 12

*Maya v. Centex Corp.*, 658 F.3d 1060 (9th Cir. 2011) ................................... 13, 25

*Sherman v. SEC* (*In re Sherman*), 491 F.3d 948 (9th Cir. 2007) ......................... 16

*Von Koenig v. Snapple Bev. Corp.*, 713 F. Supp. 2d 1066 (E.D. Cal. 2010) ........ 24

*Waller v. Blue Cross*, 32 F.3d 1337 (9th Cir. 1994) .............................................. 2

## California State Opinions

*Addison v. State*, 21 Cal. 3d 313 (1978) .............................................................. 17

*Alliance Mortgage Co. v. Rothwell*, 10 Cal. 4th 1226 (1995) ............................. 26

*Cowan v. Superior Court*, 14 Cal. 4th 367 (1996) .............................................. 16

*Glaski v Bank of America*, 2013 Cal. App. LEXIS 633 (2013) ..................... 1, 8, 26

*Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310 (2011) ................................... 15

*People v. Toomey*, 157 Cal. App. 3d 1 (1984) ..................................................... 21

*Schulz v. Neovi Data Corp.*, 129 Cal. App. 4th 1 (2005) ..................................... 21

*West v JPMorgan Chase Bank, N.A.* (2013) 214 CalApp4th 780 ........................ 26

## California State Statutes

Cal. Bus. & Prof. Code § 17200 (Deering) ......................................................... 21

## Federal Rules and Statutes

Fed. R. App. P. 32(a)(7)(B)(iii) ........................................................................... 28

12 C.F.R. pt. 226 (2012) ..................................................................................... 23

## I.    INTRODUCTION

This case is about Plaintiff, a homeowner, who has been fighting to save her home from foreclosure. She was put into a toxic LIBOR loan product which was transferred to a mortgage backed securitized trust based on market LIBOR that was drafted and controlled by the defendants.

By the time Plaintiff filed her suit, less than 20% of the loans had survived that were transferred to this pool.  Over 5,000 families were foreclosed on in this trust alone. Out of those that survived, 845 of them required loan modifications (or over 90% of the surviving loans were modified). (ER 2119)

Defendants contend plaintiff lacks jurisdictional standing. Appellant contends she was injured by these defendants and the court can address her grievance. *Glaski v Bank of America*, 2013 Cal. App. LEXIS 633 (2013).

Simply stated, Plaintiff sought legal redress on the grounds defendants gave her a subprime high interest rate loan promising her she could refinance to a lower rate in six months. She believed their hype on the grounds the LIBOR rate was much lower than the LIBOR loan product she received.  She is also suing because when she started to default, defendants promised her a modification, but the document she received did not have terms beyond April 1, 2013 in it. When HomEq refused to supply her with those material terms, she sought bankruptcy protection and eventually filed this lawsuit.

The more complex version requires the court to look at the exotic nature of the LIBOR loan the defendants crafted; why Barclays and Deutsche Bank National Trust Company ("DBNTC") were manipulating LIBOR; and how the LIBOR rate would affect servicing of plaintiff's loan and the profit to be gained from Plaintiff's loan under the terms of the mortgage backed securitized (MBS) trust that Defendants created and then transferred her loan into.[1]

Plaintiff had a stable job as a professional engineer in the planning department for the California State Lands Commission.  Yet, she was placed in an exotic subprime exploding ARM loan product manufactured only for the very wealthy.  Even the defendant's version of the Note (which plaintiff disputes as being the true note) clearly says:

ADJUSTABLE RATE NOTE

(LIBOR Six Month Index (as published in the Wall Street Journal) – Rate Cap)

2 YEAR RATE LOCK, 5 YEAR INTEREST ONLY PERIOD

(ER 295)

---

[1] Defendants' imply they were able to address the issues with fewer words. Plaintiff submitted one consolidated brief (63 pages); whereas defendants submitted two separate briefs (62 pages combined) and added 1,689 pages to the excerpts provided by the plaintiff in this case.

2

The Mortgage Backed Securitized trust (MBS) her loan was allegedly transferred into, had Interest and Cap SWAPs for the benefit of the provider (Barclays), the trustee (Deutsche Bank National Trust Company), the servicer (Barclays d/b/a HomEq Servicing and Ocwen), and the certificate holders.

The Swap Agreement clearly recites that "Barclays [Bank PLC) as swap provider" will pay the "issuing entity" (Barclay's affiliate) "4.9381% to 5.2600% per annum, during the first 58 distribution dates. (ER 1568-69; 1480-88)

Then Barclays would pay itself, the servicers, trustee, and certificate holders with the proceeds from the "supplemental interest account" which would be the money from the SWAP. (424b5 s-90)

The Interest Rate Cap agreement provided that Barclays would pay the one-month LIBOR rate to the certificate holders as a cap for the first 48 distributions.

By suppressing the LIBOR rate while concurrently charging Plaintiff 8.775% on her LIBOR loan product, defendants guaranteed to make money for itself from Plaintiff and those similarly situated.  There was zero risk in this setup because the LIBOR rate was being fixed by Barclays, DBNTC and other financial institutions. The loans were being serviced by Barclays and the Interest Rates were initially Fixed by Barclays in the LIBOR loan products like the one purchased by Plaintiff so the entire game was rigged. And it was rigged against Plaintiff.

Plaintiff had no knowledge that her LIBOR loan was not based on an independent market rate.

The prospectus stated that the servicer and trustee also profited from these funds. The stockholders could profit, too. The only party who was stuck like a fly in a spider web was Plaintiff.

She voluntarily flew into the web, with the expectation she could refinance her loan six months down the road. But she was not able to do that, and the reason for that, in substantial part, was due to the defendants' collusion in artificially lowering the LIBOR rate. There was no incentive to service her loan.

Both the Interest Rate and Cap SWAP terminated by 2012 on their own terms (after the initial 5 year period).

Plaintiff filed her action on March 1, 2012. By September, 2012 the court had dismissed her complaint and granted the defendants summary judgment.

Barclays requested that this case be joined with the in re LIBOR cases in New York in the MDL action. After this case was on appeal, the MDL panel found those separate groups of investors and municipalities lacked standing to sue.

Defendants contend that although Plaintiff had a LIBOR Interest Rate Loan product, she was not injured because the interest rate on her loan exceeded the actual LIBOR interest rate which Barclays and Deutsche Bank artificially suppressed when she was paying on her loan. She ultimately defaulted before she

4

could enjoy the benefits of the rate that was actually suppressed in the Wall Street Journal.

But that only tells half of the story. The other half consists of how the terms of the MBS trust affected the servicing of plaintiff's loan.

The media proffered that Barclays manipulated LIBOR in order to make profits for "SWAP traders." This MBS trust had both an interest rate SWAP and a cap SWAP.

Defendants used the manipulation to make money by betting against the homeowner.

The published LIBOR rate also had a profound effect upon the consumer.

If the court flips the page, Defendants peddled these high interest rate LIBOR loans to consumers leading the consumer to reasonably expect either (1) that they could refinance at a lower rate in the near future; or (2) they would soon be enjoying a much lower and hence affordable, loan product. Consequently, in the reasonable consumers mind, the toxic loan would not do any harm. (ER 2067-2099)

Plaintiff took the loan like bees take honey and was doomed to fail.

So did over 5,000 other families who were foreclosed on in this trust alone. The few that survived, 845 of them required loan modifications. (ER 2119)

5

Not only did Barclays profit, but so did Deutsche Bank National Trust Company ("DBNTC"), the trustee of the mortgage backed securities, Western Progressive the foreclosing trustee, and Ocwen Loan Servicing ("Ocwen"), the sub-servicer for Barclays d/b/a HomEq.

As a direct and proximate consequence, Plaintiff, lost money, property, incurred extra charges, expenses, damaged her credit and ability to use her home as collateral for other credit purposes.

## II.     ARGUMENT

### A. Article III Standing Was Alleged In this Case

The District court dismissed every cause of action by way of a Motion to Dismiss or Summary Judgment on the grounds plaintiff lacked standing.

This is on the ground her LIBOR loan had an initial fixed rate period. Defendants assert the court's position was correct. It is plaintiff's position that this logic is flawed because it ignored the effects the LIBOR MBS trust had on servicing her loan. *Glaski v Bank of America*, 2013 Cal. App. LEXIS 633 (2013).

Article III standing merely means that "for a federal court to have authority under the Constitution to settle a dispute, the party before it must seek a remedy for a personal and tangible harm." *Hollingsworth v. Perry*, 133 S. Ct. 2652, 2659 (2013).

6

"At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we "presum[e] that general allegations embrace those specific facts that are necessary to support the claim." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).

Plaintiff's claims were dismissed at the pleading stage as to Barclays.

Defendants do not argue that a favorable decision would redress plaintiff's injuries.  Instead, defendants insist that plaintiff fails to have Article III standing because plaintiff was not injured by defendants' conduct. (RB 13)

Standing under Article III usually arises in the context of a political question because the court is concerned with usurping the rights of other branches of government. Here, there is no such concern.  *Hollingsworth* at 2661.

Defendant narrows Article III standing down to one allegation of financial injury based on making "over $60,000.00 in interest payments based on manipulat[ing] market LIBOR." (RB 11)  First, that allegation is not a generalized grievance but a personal harm of the pocketbook.  Second, the money was fairly traceable to the defendants (ER 659).  Plaintiff also incurred attorney fees of $5,600.00 (ER 664); she was forced into bankruptcy (ER 664-665); and she lost title to her home (ER 665-666). She pled standing.

Article III standing was alleged for each cause of action pled:

- Violation of the Sherman Antitrust Act (Price Fixing); Breach of Good Faith and Fair Dealing; and UCL § 17200 - she was forced to pay interest on the LIBOR loan product "substantially higher" than those she would have paid in the absence of these violations and she was losing/has lost her home. (ER 672, 675, 676, 682)

- FAL § 17500 - Plaintiff alleged the publication of the manipulated lower LIBOR rate in the Wall Street Journal led plaintiff to believe she could enter a high interest rate and refinance to a lower rate as represented by defendant's agents at signing. This was basically the spider web she was lured into, and then became stuck. As a result she faced losing her property. (ER 684-685)

- Fraud - The fraud here was based on defendant's pattern and practice and alleged the same harm as in the preceding causes of action. (ER 689-691). Plaintiff alleged she lost the opportunity to refinance her mortgage elsewhere when the real estate market was still thriving and when she still had equity in her home. (ER 690) All of these allegations of harm caused to Plaintiff were in addition to the harm of making "over $60,000.00 in interest payments." (ER 691).

Plaintiff's case has absolutely nothing to do with using the court to attempt to usurp a political branch of government. Her grievances are not generalized and are fairly traceable to the defendants.

In *Maya v. Centex Corp.*, 658 F.3d 1060, 1065 (9th Cir. 2011), Centex Corporation and other co-defendants devised a scheme where it represented that it was building "stable family neighborhoods." In fact, defendants were selling homes to high risk buyers who were more likely to default in times of economic hardship. A group of homeowners alleged that the defendants' practices and the resulting foreclosures reduced the economic value of their own homes. *Maya v Centex*, at 1066

The Ninth Circuit found the plaintiffs had pled Article III standing due to the loss above general economic conditions. *Maya v Centex*, at 1069, 1071.

Here, defendants represented they were selling loans that could be refinanced in six months, while making it appear the true cost to borrow money was low as demonstrated by LIBOR being published in the Wall Street Journal. Defendants sold these loans to borrowers who were more likely to default in times of economic hardship while they were artificially suppressing the true market rate. Defendants egregiously bought SWAP agreements and bet against the homeowner in the pools they created and transferred these loans into. The plaintiff alleged that

the defendants' practice was a substantial factor which resulted in the default and foreclosure of her home.  There was a traceable injury alleged.

## B. Eight Key Pieces of Evidence Existed To Proceed with the Antitrust Claim

DBNTC Defendants contend there was no evidence of injury-in-fact.

There were eight key pieces of evidence to support a genuine issue of material fact existed to prove injury to Plaintiff: (1) expert Certified Forensic Accountant, Jay Patterson's report on the MBS trust (ER 2118-2120); (2) the Forward Writing Prospectus (FWP) 424b5 of the MBS trust filed by defendants with the SEC (ER 1396-1714 are the pages containing the definitions, identification of defendants, the terms, pooling and servicing agreement, Interest Rate SWAP and Cap SWAP agreements; pages 1720 -1988 are the identification of loans, loan terms and putative class members); (3) the Declaration of William Matz (ER 2067-69); (4) the undisputed declaration of Helen Galope (ER 2070-2099); (5) the Oral Transcript of Bob Diamond of July 4, 2012 (ER 1998-2030); (6) BBC News article dated July 31, 2013 "Libor scandal:  Deutsche Bank admits some staff involved" et al (ER: 2035-2040); (7) Admission of facts "Appendix A" of the Non-Prosecution Agreement dated June 26, 2012 between the USDOJ and Barclays Bank, PLC (ER 1304-1324); and (8) Order Instituting Proceedings

10

Pursuant to Section 6(c) of the Commodity Exchange Act against Barclays PLC (ER 1326-1366).

## 1. Plaintiff Purchased a LIBOR Loan Product From the Defendants Who Were Manipulating LIBOR Market Rates

Home loan origination expert, Bill Matz declared that it was "standard industry response to say "Don't worry, we'll refinance you" to lull a borrower into a LIBOR exploding ARM with a high interest rate. (ER 2067) He opined borrowers "informed of the actual manipulation going on" would not accept a LIBOR-based loan on the grounds it was implicit that the rates were based on independently determined index. (ER 2068) Plaintiff's uncontradicted testimony is that she expected a fixed rate loan, but a LIBOR loan was presented to her (bait-and-switch) and if she had known that Barclays was manipulating the LIBOR rate, she would have never taken the loan. (ER 2070).

The record contained Jay Patterson's report that demonstrated 7,533 loans were supposedly to be transferred to the MBS trust in 2007. (ER 2119). Only 1,956 homeowners (26%) were still surviving in this toxic trust by 2012. Out of these 1,956 homeowners that were still surviving, 827 of those loans were modified (42%). So, borrowers who were able to survive in this toxic set up were only 1,129 (15%). (ER 2119). These are the hard facts.

11

The Mortgage Backed Securitized trust (MBS) her loan was allegedly transferred into, then had Interest and Cap SWAPs for the benefit of the provider (Barclays), the trustee (Deutsche Bank National Trust Company), the servicer (Barclays d/b/a HomEq Servicing), and the certificate holders.

The Swap Agreement states "Barclays [Bank PLC) as swap provider" will pay the "issuing entity" (Barclay's affiliate) "4.9381% to 5.2600% per annum, during the first 58 distribution dates. (ER 1480-1488)

Then Barclays would pay itself, the servicers, trustee, and certificate holders with the proceeds from the "supplemental interest account" which would be the money from the SWAP. (424b5 s-90)

The payments were contingent on market the one-month LIBOR rate for the first 48 distributions.

By suppressing the LIBOR rate while concurrently charging Plaintiff 8.775% on her LIBOR loan product, Barclays and DBNTC guaranteed to make money for itself from Plaintiff.  There was zero risk in this setup because the LIBOR rate was not based on true market rates but it was being set by Barclays, DBNTC and other financial institutions.

With this manipulation, there were no competitors. They were all in it together.

The prospectus states that both the servicer and trustee make money from these funds in addition to Barclays as the provider. The only party who was stuck like a fly to toxic paper was Plaintiff.

She entered with the expectation she could refinance her loan six months down the road. But she was not able to do that, and the reason for that, in substantial part, was due to the defendants' collusion.

Both the Interest Rate and Cap SWAP terminated by 2012 on their own terms (after the initial 5 year period).

## 2. The Injury is Fairly Traceable To the Defendants

Plaintiff prayed for an injunction, damages, fees and costs for the foreclosure due to defendants conduct for the harms she sustained due to the antitrust allegations. (ER 672, 675, 676, 682)

The focus here, is not on the injury, but who caused the injury.

For an injury to be fairly traceable to defendant's conduct, merely means that the injury can be fairly traced to the defendant before the court and not some third party. *Simon v. E. Ky. Welfare Rights Org*., 426 U.S. 26, 60 (1976).

Plaintiff is complaining about the overcharges, the default and foreclosing on her home in a LIBOR loan product she was thrown into where the ones who created the loan and took her money were foreclosing for their benefit as they bet against her in the MBS trust that was tied to LIBOR. This is fairly traceable to the

defendants who were the MBS trustee, servicer, provider, and foreclosing trustee on her LIBOR loan.

### 3. The Defendants Profited Through the MBS Trust Which Used LIBOR for The Interest Rate and Cap SWAPS

The trustee, DBNTC, the provider, Barclays, and the servicers, Barclay's d/b/a as HomEq and Ocwen, each received money from the Interest Rate SWAP and Cap SWAP in the LIBOR MBS trust. (ER 1568-69, 1480-88)

The servicer pays the foreclosing trustee from this pool. (ER 1488 et seq Pooling and Servicing Agreement)

One of the multiple smoking guns in the FWP is the "Hypothetical Available Funds and Supplemental Interest Rate Cap Table" which can be found at ER 1516-1522)

There is not enough space to fully explain this in a brief but this is an example of how intertwined market LIBOR was tied to this MBS trust.

Suffice to say, it is not just a LIBOR loan making her a direct purchaser of a LIBOR product, but her loan was placed in a LIBOR MBS trust where the terms of that trust made her loan toxic because the defendants could further profit off of her, through the LIBOR market rate in excess of merely servicing and admin fees. This worked adversely to being treated fairly as they serviced her loan. Her harm is fairly traceable to the defendants in this case.

14

### 4. Plaintiff Had Standing as a Direct Purchaser Under Antitrust Law

Defendants contend there was no antitrust standing. (RB 13).

### a. Rational Expectations Test

Defendants argue that new legal theories cannot be raised on appeal for the first time. (RB 16) Such issues are properly brought to the appellate panel's attention for the first time on appeal because they are pure issues of law. *Columbia Steel Casting Co., Inc. v. Portland General Electric Co*., 111 F.3d 1427, 1443 (9th Cir. 1997).

Defendants contend plaintiff used the "target area" test for the first time on appeal and that this test has been "discredited" citing, *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 103 S. Ct. 897, 74 L. Ed. 2d 723 (1983). In *Associated General Contractors of California, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 103 S. Ct. 897, 74 L. Ed. 2d 723 (1983), the Supreme Court identified a number of prudential factors for determining whether an antitrust plaintiff has standing. "These factors include: (1) the nature of the plaintiff's alleged injury; that is, whether it was the type the antitrust laws were intended to forestall; (2) the directness of the injury; (3) the speculative measure of the harm; (4) the risk of duplicative recovery; and (5) the complexity in apportioning damages." *American*

*Ad Mgmt., Inc. v. General Tel. Co. of Cal.*, 190 F.3d 1051, 1054 (9th Cir. 1999) (citing AGC, 459 U.S. at 535).

Here, the non-prosecution agreement and Order instituting proceedings by the Commodities Exchange Administration is sufficient to demonstrate that this is the type of injury anti-trust laws were intended to forestall. Failure to properly service the loan, leading to the loss of a home or being forced into default by the excess charges after a false promise of the ability to refinance to a lower rate in 6 months is not speculative. All of the data needed to apportion the damages is sitting in Patterson's report and in the business records of those managing the MBS trust. There is no risk of duplicative recovery.

Defendants devised a scheme where it represented that the true cost to borrow money was low as demonstrated by LIBOR being published in the Wall Street Journal. Defendants then represented, through their agents, that borrowers did not need to fear entering into the LIBOR loans that were initially at a higher rate on the grounds they could refinance at a lower rate. They bet against plaintiff and cashed in.

DBNTC was the MBS trustee and one of the 16 banks who manipulated LIBOR and was also making money on the Interest Rate and Cap SWAPS in the MBS toxic trust.

Defendants' practice was a substantial factor which resulted in the foreclosures on their homes.

### b.  Consumer Expectations Test

The Defendant does not want this court to review the consumer expectation test on this record. (RB 13-14).  But, this is an issue of pure law that was raised in the opening brief to assist this court in coming to the correct conclusion. Such issues are properly brought to the appellate panel's attention for the first time on appeal because they are pure issues of law. *Columbia Steel Casting Co., Inc. v. Portland General Electric Co.*, 111 F.3d 1427, 1443 (9th Cir. 1997).

Courts are faced with new schemes all of the time. Not all schemes fall neatly into a certain category.

Toxic loans + Toxic MBS trusts + Manipulation of the market rate = Default and foreclosure.

Defendants summed up the reason why this panel should consider the test: because it is a test "reserved for cases in which the everyday experience of the [consumer] permits a conclusion that the product[] violated minimum safety assumptions." (RB 15-16).

What plaintiff consumed here, was not safe.

### c.  Direct Injury Test and *Illinois Brick*

None of the defendants briefed whether or not Plaintiff fit within one of the two direct injury groups. Defendant merely argued that the target area test was discredited. But AGC never addressed *Studio Unions v Loews, Inc*., 193 F. 2d 51 (9th Cir. 1951)  It has never been overruled.

Defendants have not addressed how *Illinois Brick* would apply.

Whether or not defendant offered a modification is all smoke and mirrors. The damage was already done at that point in time and Plaintiff was facing foreclosure.

In *Illinois Brick*, 431 US 720, 728-29 (1977) the Supreme Court held that any benefit gained by the defendant through anticompetitive conduct which violates the federal antitrust laws is to be taken away from the wrongdoer by the direct purchaser.

The money defendants gained from the interest rate SWAP and Cap SWAP in the MBS trust should be taken away from the defendant by the plaintiff via her antitrust claims because she was a direct purchaser. This was her money.

## 5.  There was Evidence of a Contract, Combination or Conspiracy Between DBNTC and Barclays

Defendants ignore price fixing as a *per se* violation and the evidence of a contract or combination. (RB 18).

Even if it were not *per se*, the relevant test is whether there is evidence of a "contract, combination, or conspiracy" that "deprive[d] the marketplace of independent centers of decision making." *American Needle, Inc. v. NFL*, 560 U.S. 183 (2010), citing *Copperweld Corp. v. Independence Tube Corp.* (1984), at page 467.

The Notes and MBS trust evidence the contract and combination. The conspiracy and deprivation in the market by price fixing LIBOR is evidenced in the vicarious admissions in news articles; the Non-prosecution admissions with the US DOJ; and Bob Diamond's testimony.

Barclays and DBNTC do not dispute that they are separate competitive entities in the financial world. Material facts exist to reverse summary judgment.

### C. Standing Under the UCL was Adopted from Article III

Defendants next contend plaintiff lacked standing under the UCL. (RB 14)

California borrowed the concept of standing under the UCL from Article III standing in federal cases.

As explained in *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 323 (2011), in order to have standing to pursue a UCL claim, the private party must have suffered a monetary or property loss of an "identifiable trifle." *Kwikset Corp.*, 51 Cal. 4th at 323.

Plaintiff alleged that she paid a higher interest, had her title clouded with a default, paid $5,000.00 to an attorney, she finally lost title completely, and although they rescinded the sale after litigation started, she is still facing foreclosure and is in imminent danger of losing her home to foreclosure. More than an "identifiable trifle" has been alleged and proven.

### D. UCL Claims Could Not Be Released

1. **Alteration of the Modification Document by Defendants Extinguished the Contract**

DBNTC group together the second, third, and fourth claim for UCL liability and state the claims are barred due to the "release" in the "modification." (RB 19)

First, the 'modification' failed to contain material terms in violation of Regulation Z so the contract was void, and so was the release. Second, the entire contract was extinguished when defendants altered what plaintiff had actually signed by adding in the missing terms after she executed it. *California Savings & Commercial Bank v McIntosh,* 216 Cal. 742 (1932)

It was undisputed all she signed was the partial contract with missing terms. Consequently, there is no effective release to enforce. At least an issue is raised in this regard.

Similarly there is nothing to integrate and it does not bar the oral promises made. (RB 25-26)

### 2. The Release is Void Against Public Policy

Additionally, the release is void against public policy. *Hick v. Thomas,* 90 Cal. 289 (Cal. 1891), *See also, Tunkl v Regents Univ. of Cal*., 60 Cal2d 92 (1963).

Releases for intentional conduct such as fraud, UCL, or antitrust violations are void and have been for a very long time as codified in Cal Civ Code §1668. *City of Santa Barbara v Superior Court* 41 Cal 747 (2007). (See also *Tunkl v. Regents of University of Cal.* (1963) 60 Cal.2d 92.)

Since the claims are based on fraud, UCL, FAL and antitrust violations, a release is void and has no effect. If the court found plaintiff was barred due to the release, that decision should be reversed.

### 3. DBNTC was Personally Liable for Manipulation

Defendants next contend that DBNTC is only being held vicariously liable. DBNTC never identifies who DBNTC believes it is being held vicariously liable for. (RB 22). Without knowing who DBNTC believes it is being held liable for, there is no way to understand or respond to defendant's argument on this issue.

### 4. Restitution is Allowed Under the UCL

Defendant contends that restitution is not allowed. (RB 29) Restitution is allowed. *Zhang v. Superior Court*, *supra*, __ Cal.4th __ [pp. 4-6] (2013)

"Restitution under [Business and Professions Code] section 17203 is confined to restoration of any interest in 'money or property, real or personal, which may have been *acquired* by means of such unfair competition." *Zhang*, at 8.

Plaintiff bought a loan that was illegal due to the antitrust violations. It was toxic. The defendants acquired money she paid on this toxic property and her legal title. She is entitled to have both restored. Plaintiff's continuing obligations to pay were extinguished through the defendants' own wrongful conduct.

Second, California will consideration the securitization process where there are "concrete facts" that something in regard to the securitization has adversely affected the borrower. *Glaski v Bank of America* 2013 Cal. App. LEXIS (2013), at page 633.

*Glaski* is relevant, not only as to LIBOR, but on the grounds that it demonstrates there must be consideration of the securitization process when there are concrete facts alleged, as here, that the defendant is not holding the loan (the note and deed of trust representing the debt obligation) as evidenced by the terms laid out in the 424b5 and pooling and servicing agreement. The court of appeal found that New York trust law, when read literally, did in fact make such transfers void in order to avoid adverse tax consequences to the investors. Consequently, the subsequent assignments or trustee's deeds recorded in the California County Recorder's office would be void, too.

This is directly relevant here, where we have the plaintiff and some documents dated December 16, 2006 (not December 26, 2006). This would be outside the 90 day window to transfer the loan to this MBS trust.

Plaintiff is entitled, at the very least to her payments made, and if equity so finds, to her title to her property.

### 5. Fraudulent Business Practices Do Not Require FRCP 9(b) Pleading

Defendants contend a fraudulent business practice under the UCL must be pled with specificity. (RB 30). California does not require UCL claims for fraudulent conduct to be pled with specificity.  (*Morgan v. AT&T Wireless Services, Inc.* (2009) 177 Cal.App.4th 1235, 1257; see also *Klein v. Chevron U.S.A., Inc.* (2012) 202 Cal.App.4th 1342, 1381.) There is a split in the federal courts. In any event, this was a summary judgment not a 12(b)(6) motion and the MBS and Note were specified.

### 6. Selling the Home During A Bankruptcy Stay Was a UCL Violation

Finally, Defendants knew there was a bankruptcy stay and took her property during the stay. Thereafter, when she demanded the transfer back to her name, they refused until this lawsuit was filed and they were confronted with a temporary restraining order. (ER 338-349)

Plaintiff expressly had the right to sue in district or bankruptcy court. *Menk v. Lapaglia* 241 B.R. 896 (9th Cir. 1999).

Violations of 11 USC § 362 entitle plaintiffs to damages, including emotional distress, attorney fees and costs. It is irrelevant that these defendants were foreclosing. *Menk*.

Furthermore, this is a proper UCL claim. The UCL prohibits "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." *(Summit Tech. v. High-Line Medical Instruments, Co.* (C.D.Cal. 1996) 933 F.Supp. 918.)

An *unlawful* business practice can be "anything that can properly be called a business practice and that at the same time is forbidden by law." *Stop Youth Addiction, Inc. v. Lucky Stores, Inc.*, 17 Cal. 4th 553 (1998); Cal. Penal Code § 308.

The 1992 Amendment to §17203 made clear that the law expressly reaches prior – and hence discontinued – acts of unfair competition in addition to continuing conduct. *Klein v Earth Elements, Inc*., 59 Cal. App 4th 965, 969 (1997).

As explained in *McKell v Washington Mutual, Inc.*, *McKell*, 142 Cal. App. 4th 1457 (2006) "[b]y extending to business acts or practices which are "unlawful," "the UCL permits violations of other laws to be treated as unfair

competition that is independently actionable. [Citation] Even if the violation of another law does not create a private right of action, if the violation constitutes unfair competition, it is actionable." *Id. at* 1474-75 (2006); *Kasky v. Nike, Inc.*, 27 Cal. 4th 939, 949-50 (2002). *See Cel-Tech Comm'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th at p. 180.

Congress did not forbid a private right of action so the UCL claim is allowed. *Rose v. Bank of America, N.A.*, 2013 Cal. LEXIS 6521 (2013).

The trustee's deed upon sale, notice to the defendants in bankruptcy (ER 337), and order demonstrating the stay was in effect at the time of the sale all supported a denial of the summary judgment motion. (ER 337-349)

The court erred, and the decision should be reversed.

## E. The Defendants Are Capable of Foreclosing Again in Violation of Plaintiff's Federal Rights

Defendants contend the issue is moot on the grounds they gave title back after suit. (RB 34)

However, this ignores the fact that it does not address plaintiff's emotional or monetary injuries and that the defendant is capable of doing it again. Plaintiff faces imminent foreclosure, the default is still recorded.

There is no evidence this was a rare practice. It is nothing more than the type of harm that is part of a "pattern of officially sanctioned behavior" violating the plaintiffs' federal rights. *LaDuke v. Nelson,* 762 F.2d 1318, 1323 (9th Cir. 1985).

Consequently, harm exists that the court can redress.

### F. Equity is Not Required for a Wrongful Foreclosure Claim

Equity is not a precondition to recovery for wrongful foreclosure. See, *Glaski v Bank of America*, 2103 Cal App LEXIS 633 (2013). *Pfeiffer v Countrywide Home Loans, Inc.* 211 CalApp4th (2012), at page 1250, *West v JPMorgan Chase Bank, N.A.* 214 CalApp4th 780 (2013), and *Jolley v Chase Home Finance* 213 CalApp4th 872 (2013).

### G. Aiding and Abetting of the UCL Was Tied to the UCL Claim

Defendants contend that this claim was not tied to a tort claim. (RB 16). The claim was tied to UCL §17200." (ER 685).

Cal. Bus. & Prof. Code § 17200 (Deering) can act as the predicate claim for aiding and abetting. *Schulz v. Neovi Data Corp.*, 129 Cal. App. 4th 1 (2005), transferred 56 Cal Rptr 3d 471 (2007), abrogated as stated *Perfect 10, Inc. v. Visa Int'l Serv. Ass'n* 494 F 3d 788 (9th Cir. 2007); See also, .*McKay v. Hageseth* 2007 US Dist LEXIS 29436 (ND Cal 2007) (motion to dismiss denied because Section 17200 liability could be based on aiding and abetting unlawful business

practices, by paying others to participate in a scheme to distribute dangerous drugs to patients sans appropriate examination.)

As stated on page 43 - 44 of the opening brief, DBNTC has admitted that some of its staff was involved in this market manipulation. (ER 2037, 2039) A defendant need not know that the conduct was unlawful, but the defendant who has knowledge of the conduct and assists by aiding and abetting can be held liable. *People v. Toomey*, 157 Cal. App. 3d 1 (1984).

Consequently, if the appellate panel should find that the district court's dismissal of the UCL claim should be reversed, the aiding and abetting claim should be reversed, too.

### H. The FAL Claim Was Not Time Barred

Barclay's contend plaintiff's FAL claim was time barred and she has waived her right to challenge this. (RB 18).

Statute of limitations is an issue of jurisdiction. *Cowan v. Superior Court*, 14 Cal. 4th 367 (1996). Hence, it is never waived. *Sherman v. SEC*, 491 F.3d 948, 965 n.20 (9th Cir. 2007).  It is an issue of pure law**.**  *Columbia Steel Casting Co. v. Portland GE*, 111 F.3d 1427, 1443 (9th Cir. 1996).

The claim was not time barred because all claims were equitably tolled while Plaintiff was in bankruptcy.

An amended complaint relates back to the original complaint, and thus avoids the statute of limitations as a bar, if it (1) rests on the same general set of facts as the original complaint and (2) refers to the same accident and the same injuries as the original complaint. *Norgart v. Upjohn Co.* 21 Cal.4th 383, 408-409 (1999). Here, Plaintiff originally filed her complaint and this claim in the District court on March 1, 2012. The same set of facts as to the modification were previously dismissed without prejudice in the US Bankruptcy court.

"The relation-back doctrine deems a later-filed pleading to have been filed at the time of an earlier complaint which met the applicable limitations period, thus avoiding the bar" *Quiroz v. Seventh Ave. Center* 140 Cal.App.4th 1256, 1278 (2006).

Equitable tolling is a court-fashioned rule which applies in those situations in which the statute of limitations has run on a state court claim while the plaintiff has diligently pursued his or her remedies in an alternative forum. The doctrine is applied "to soften the harsh impact of technical rules which might otherwise prevent a good faith litigant from having a day in court" *Addison v. State*, 21 Cal. 3d 313, 316 (1978), and can be applied to prevent a forfeiture in any situation in which the first action has failed to accomplish its purpose.

The California Supreme Court held in *Addison v. State of California, supra,* 21 Cal.3d 313 (hereafter *Addison*) that the filing of a federal district court

28

action suspended the running of the six-month statute of limitations within which to bring a suit against a public entity in state court under the well-established doctrine of "equitable tolling." Id. at 316. Like the Galope case, the federal proceeding was dismissed without prejudice to re-filing in another court.

The *Addison* court stated: "courts have adhered to a general policy which favors relieving plaintiff from the bar of a limitations statute when, possessing several legal remedies he, reasonably and in good faith, pursues one designed to lessen the extent of his injuries or damage." (*Addison, supra,* 21 Cal.3d at pp. 317-318.)

Two separate simultaneous actions would be inefficient. (*Addison, supra,* 21 Cal.3d at p. 319.) (See also, *Collier v. City of Pasadena* (1983) 142 Cal.App.3d 917, 924.)

On April 7, 2008 Plaintiff received a fax of a modification with missing material terms. (ER 661) After that time Plaintiff noticed the terms were not stated after April 1, 2013. (ER 662)  Plaintiff hired an attorney to assist and defendants filed a notice of default and started to foreclose on July 31, 2009. (ER 664)  On January 15, 2010, Plaintiff filed for bankruptcy to bring the creditor of her loan to the bargaining table. (ER 665) She filed again in July 2011. (ER 665).  On March 1, 2012 Plaintiff filed this action. The statute was tolled on the grounds her claim was timely when she filed her bankruptcy proceeding on January 15, 2010.

29

Consequently, the court should find that equitable tolling applies and Plaintiff was not prevented from maintaining a FAL claim based on the three year statute of limitations.

## I. Evidence Supported a Genuine Issue of Material Fact on the FAL Claim

Defendants contend there was no evidence DBNTC was involved in the publications. Plaintiff presented evidence of the LIBOR rates that were published, DBNTC's authorized agent telling the newspaper that some of their employees were involved in suppressing the LIBOR rates published in the Wall Street Journal, and the prosecutorial agreements, news articles, and declarations of Galope and Matz. (ER 1998-2030; 2035-2040; 1304-1324; 1326-1366) Evidence existed for this claim to proceed.

Defendant concludes that plaintiff did not address the issue of FAL in her opening brief. (RB 33). However, the FAL was addressed in pages 45-46.

## J. Plaintiff Had Standing to Bring A Breach of Good Faith and Fair Dealing Claim And the Land Records Supported Reversal of Summary Judgment

Promptly and fully complying with TILA was implied in the DOT to which defendants became a party. The DOT states that the parties are bound by RESPA. (ER 302-320) Defendant was neither prompt nor did it fully comply with TILA

when it refused to disclose all material terms of the Modification to the DOT. As a result, plaintiff suffered a foreclosure.

DBNTC asserts that breach of good faith and fair dealing lacks evidence. (RB 37). The deed of trust had a RESPA clause in it. (ER 302-320).The defendants chose to substitute themselves into that contract by way of substitution of trustee, declaring agency agreements in the Notices of Default, and assignments of the deed of trust. (ER 329-332, 334-345).

Consequently, it is implied that defendants would comply with TILA. However, it failed to do so by sending Plaintiff a modification agreement that did not disclose all material terms. (ER 2070-2099)

Regulation Z promulgated by the Federal Reserve Board under the Truth in Lending Act (12 CFR §226 et seq) mandates disclosure of those missing terms and it was implied that the defendants would provide them at the time of signing. It was surely implied that upon Plaintiff's notice, they would have supplied them at that time. Instead they waited until the middle of litigation to provide their terms. That was a clear breach and so supported.

Barclays contends that Article III standing cannot rest on a TILA-related injury. (RB 19) The Ninth Circuit has already found that injury-in-fact for purposes of Article III standing exists on the grounds the appellant suffered the

loss of a statutory right under TILA. *DeMando v. Morris*, 206 F.3d 1300 (9th Cir. 2000)

Reversal is warranted.

## K. The Fraud Was A Pattern and Practice That Was Fairly Traceable to Defendants

Defendants contend that Plaintiff's loan was not tied to LIBOR. The damage from the fraud is fairly traceable to the defendants. Plaintiff purchased a LIBOR loan product that defendants transferred to a MBS trust where market LIBOR was used to make extra profit through the Interest rate SWAP and its Cap SWAP agreements in the MBS trust after she was promised she could refinance in six months. The toxic trust directly affected the servicing of her loan. By the time her case was filed most the loans were in default and/or foreclosed.

She was deceived. If she had known that her loan servicer could manipulate that rate and would not be able to refinance, she would not have purchased the loan. Allegations of representations from product labels and statements that, had consumers not been deceived by the labels, they would not have purchased the product, are sufficient to plead under Rule 9(b) in a fraud claim. *Von Koenig v. Snapple Bev. Corp.*, 713 F. Supp. 2d 1066, 1077-78 (E.D. Cal. 2010).

Lenders are not immune from suits surrounding MBS trusts from borrowers when that trust affects the loan. *Glaski v Bank of America*, 2013 Cal. App. LEXIS

32

633 (2013). Here, the trust affected the servicing of plaintiff's loan. There was no incentive to work with her in making an affordable mortgage.

Plaintiff did not enter into the loan intending to default. She entered into the loan on the grounds she expected that she could refinance at a better due to the lower market LIBOR and promises. She was not able to do that, to her injury. "Except in the rare case where the undisputed facts leave no room for a reasonable difference of opinion, the question of whether the plaintiff's reliance is reasonable is a question of fact.' *"Alliance Mortgage Co. v. Rothwell*, 10 Cal. 4th 1226, 1239 (1995). See also, *West v JPMorgan Chase Bank, N.A*. 214 CalApp4th 780 (2013)

This court should reverse the dismissal of this claim for lack of standing or reasonable reliance.

## L.    CONCLUSION

For the foregoing reasons, the summary judgment in favor of defendants should be reversed, and costs should be awarded to appellant.

Dated: August 14, 2013                Respectfully Submitted,
                                                      LAW OFFICES OF LENORE ALBERT


                                                      */s/ Lenore Albert*_____

                                                      *LENORE L. ALBERT, ESQ.*
                                                      *Counsel for Plaintiffs – Appellants, Helen*
                                                      *Galope on behalf of herself and all others*
                                                      *similarly situated*

## STATEMENT OF RELATED CASES

Plaintiffs/Appellants are not aware of the following cases pending in this

Court that would be deemed related pursuant to Ninth Circuit Rule 28-2.6.

Dated:  August 14, 2013                    Respectfully Submitted,
                                           LAW OFFICES OF LENORE ALBERT


                                           */s/ Lenore Albert*_____

                                           *LENORE L. ALBERT, ESQ.*
                                           *Counsel for Plaintiffs – Appellants, Helen*
                                           *Galope on behalf of herself and all others*
                                           *similarly situated*

34

## CERTIFICATE OF WORD COUNT

I certify that this brief complies with enlargement of brief size permitted by the Ninth Circuit Rule 28-4.  The brief's type size and type face comply with Fed Rule of Civ Proc 32(a)(5) and (6). This brief has 6,977 words including this Certificate and excluding the portions exempted by the Fed. R. App. P. 32(a)(7)(B)(iii), if applicable.

Dated:  August 14, 2013          Respectfully Submitted,
                                 LAW OFFICES OF LENORE ALBERT


                                 */s/ Lenore Albert*_____
                                 *LENORE L. ALBERT, Esq.*
                                 Counsel for Plaintiffs – Appellants, Helen Galope
                                 *On behalf of herself and all others similarly situated*

35

PROOF OF SERVICE

STATE OF CALIFORNIA, COUNTY OF ORANGE:

I declare that I am over the age of 18 years, and not a party to the within action; that I am employed in Orange County, California; my business address is 7755 Center Avenue Suite #1100, Huntington Beach, CA 92647.

On August 14, 2013, I served a copy of the following document(s) described as:

**APPELLANT'S COMBINED REPLY BRIEF IN RESPONSE TO ALL APPELLEES' BRIEFS**

on the interested parties in this action as follows:

<u>See attached Mail List</u>

**[ ] BY OVERNIGHT MAIL** – I caused such document(s) to be placed in pre-addressed envelope(s) with postage thereon fully prepaid and sealed, to be deposited as Express/Priority Mail for next day delivery at Westminster, California, to the aforementioned addressee(s).

**[x] BY CM/ECF** – I caused such document(s) to be transmitted to the office(s) of the addressee(s) listed above by electronic mail at the e-mail address(es) set forth pursuant to FRCP 5(d)(1).

**[ ] BY EMAIL** – I caused such document(s) to be transmitted to the office(s) of the addressee(s) listed above by email at the e-mail address(es) set forth pursuant to agreement between counsel.

**[ ] BY FAX** – I caused such document(s) to be transmitted facsimile from the offices located in Westminster, California this business day to the aforementioned recipients.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.


Dated: August 14, 2013

/s/ Lenore Albert_____

Lenore Albert

36

Mailing List

For Defendant Western Progressive, LLC; Defendant Ocwen Loan Servicing, LLC and

Defendant Deutsche Bank National Trust Company:

Robert Norman, Esq.
Brent Kramer, Esq.
HOUSER & ALLISON
3780 Kilroy Airport Way, Suite 260
Long Beach, CA 90806
Telephone: (562) 256-1675
Fax: (562) 256-1685
Email: rnorman@houser-law.com
Email: Bkramer@houser-law.com


For Defendant BARCLAYS BANK, PLC; BARCLAYS CAPITAL REAL ESTATE INC. d/b/a HOMEQ SERVICING:

Scott H. Jacobs (SBN 81980)
shjacobs@reedsmith.com
Brandon W. Corbridge (SBN 244934)
bcorbridge@reedsmith.com
Margaret Anne Grignon (SBN 76621)
mgrignon@reedsmith.com
REED SMITH LLP
355 South Grand Avenue, Suite 2900
Los Angeles, CA  90071-1514
Tel: (213) 457-8000
Fax: (213) 457-8080

James Meadows
jmeadows@bsfllp.com
Jonathan D. Schiller
jschiller@bsfllp.com
Boies, Schiller & Flexner LLP
575 Lexington Avenue, 7th Floor
New York, NY 10022
Tel:   (212) 446-2300

37

Fax:  (212) 446-2350

David H. Braff
braffd@sullcrom.com
Yvonne S. Quinn
quinny@sullcrom.com
Jeffrey T. Scott
scottj@sullcrom.com
Matthew S. Fitzwater
fitzwaterm@sullcrom.com
Adam S. Paris
Parisasullcrom.com
Sullivan & Cromwell LLP
125 Broad Street
New York, NY 10004
Tel: (212) 558-4705
Fax: (212) 558-3588

Hon. Cormac J. Carney
United States District Court
Central District of California
411 W. Fourth Street, #1053
Santa Ana, CA  92701-4518

Attorney General's Office:
Appellate Coordinator
Office of the Attorney General
Consumer Law Section
300 S. Spring Street
Los Angeles, CA 90013-1230